# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2020, 11:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Megan J. Schueler
Ferguson & Ferguson
Bloomington, Indiana

ATTORNEY FOR APPELLEE

Vincent S. Taylor
Bloomington, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Kyung Sil Choi, Bo Kang Park, and Han Chong,

*Appellants-Defendants,*

v.

Jung Hee Kim,

*Appellee-Plaintiff.*

June 26, 2020

Court of Appeals Case No. 19A-PL-1429

Appeal from the Monroe Circuit Court

The Honorable Elizabeth Cure, Judge

Trial Court Cause No. 53C04-1611-PL-2260

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Defendants, Kyung Sil Choi (Choi), Bo Kang Park (Park), and Han Chong (Chong) (collectively, Appellants), appeal the trial court's denial of their motion to correct error thereby affirming the jury's verdict in favor of Appellee-Plaintiff, Jung Hee Kim (Kim).

We reverse.

# ISSUES

Appellants raise three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion in tendering certain information to the jury after jury deliberations commenced; and

(2) Whether sufficient evidence exists to support the theft verdict against Appellants.

# FACTS AND PROCEDURAL HISTORY

In February 2012, Kim, a South Korean national and Choi's sister-in-law, visited the United States on a tourist visa. She attempted to return to the United States in January 2014 with her children to visit Choi. However, due to an immigration violation during a previous visit, Kim and her children were denied entry into the country and had to leave immediately. Choi was travelling to South Korea at the same time and therefore Kim and her children

left on the same flight as Choi. During the flight, Choi and Kim discussed different possibilities for Kim to potentially return to the United States.

[5] Park was the sole shareholder of Oya, which owned two restaurants: the Sake Bar and Japonee. The restaurants operated in leased space in a building managed by Chong. In 2012, a fire partially destroyed Japonee. While Japonee was being rebuilt, Park opened the Sake Bar. Upon Japonee's reopening, Park was no longer interested in operating the Sake Bar and started searching for a purchaser. Choi contacted Kim and they talked about Kim's interest in investing in the Sake Bar. An investment in the Sake Bar would permit Kim to apply for an E-2 visa, an investor visa which allows an individual to enter and work in the United States based on an investment the individual will be controlling while residing in the country. In March 2014, Choi directed Kim to send $15,000 to Oya as payment for the Sake Bar, with another $135,000 in April 2014. Park and Chong used the money from the sale of the sake bar to build a hibachi grill in the same building that housed Japonee. Park provided Chong with a budget of $150,000 to complete the grill portion of the restaurant.

[6] Meanwhile, Kim, at Choi's advice, contacted an immigration attorney to commence Kim's E-2 visa application. Choi paid Kim's attorney expenses. During the trial proceedings, Kim denied reviewing her E-2 visa application and denied signing most of the application documents, including the Asset Purchase Agreement for the purchase of the Sake Bar from Oya, the entry of appearance, and the DS-156, which acknowledges that the E-2 visa packet was

true to the best of her knowledge, as well as several other items. However, Kim's immigration attorney testified that he met with Kim for about an hour to an hour and a half to review the E-2 visa application. He explained important parts of the application to Kim, including the Asset Purchase Agreement, which supported Kim's investment or purchase of a business in the United States. The first visa application was denied. At Choi's request, Chong assisted Kim with the second visa application by sending her bank statements from Oya, reflecting that Kim had invested money in the United States, that this money was spent and that she would not be able to get it back. After an immigration interview in January 2015, Kim received an E-2 visa for entry into the United States.

[7]     In July 2015, Kim and her children entered the United States on the E-2 visa. She lived with Choi, rent-free, and worked at Sobon, Choi's restaurant. She did not inquire about the Sake Bar at that time and did not talk to Park, the principal of Oya, about taking over the Sake Bar although Park informed her that she needed to change the utilities at the Sake Bar into her name and to open a bank account. While Kim resided with Choi, Choi provided her with $1,240 for working at Sobon and with an additional $9,000 to $10,000. Because Kim did not enjoy working at Sobon, she discussed with Chong, whom she thought owned Japonee, whether she could work at Japonee.

[8]     Chong assisted Kim in working at Japonee, obtaining a phone, using his car, and assisting her children. In October 2015, Chong helped Kim secure an apartment. However, by the end of October or the beginning of November 2015, Kim became afraid of Chong and alleged that he sexually harassed her.

[9] On November 7, 2016, Kim filed a Complaint sounding in contract, conversion, and fraud. On March 8, 2017, Appellants filed an amended motion to dismiss based on Kim's failure to sue the proper party in interest, as well as her failure to properly plead fraud. On June 22, 2017, the trial court ruled that Count II, fraud and conversion, should be dismissed based upon a failure to properly plead. On June 28, 2017, Oya intervened, alleging breach of contract against Kim because she had failed to meet the contractual provisions of the Asset Purchase Agreement. On September 19, 2018, Kim moved to amend her Complaint to include a theft and conversion allegation. Subsequently, from April 8 to April 16, 2019, a jury trial was conducted. At the close of the evidence, the jury returned a verdict on the sole issue of theft, finding Appellants responsible for theft and assessing them with an amount of $350,000. The trial court awarded Kim attorney fees in the amount of $38,648.54. On May 17, 2019, Appellants filed a motion to correct error. In the absence of the trial court ruling on the motion within forty-five days, the motion was deemed denied pursuant to Indiana Trial Rule 53.3.

[10] Appellants now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[11] While legal proceedings are seldom perfect, this case has been fraught with difficulties from the beginning, with the overall tone being set by the trial court mentioning that the proceedings could transform into a possible "shit show." (Transcript Vol. I, p. 71). The theatrical stage was set by Kim's counsel who, during the final pre-trial conference on March 3, 2019, instead of addressing

Appellants' motion in limine on its merits, resorted to an *ad hominin* attack by advising the trial court that Appellants' counsel "is an example of everything about attorneys that people hate." (Tr. Vol. I, p. 14). Kim's counsel elaborated that Appellants' counsel "is going to object to every question I ask and to put a jury through that," is "disgusting." (Tr. Vol. I, p. 8). He added that counsel "won't listen to anything, our depositions are like wars[.]" (Tr. Vol. I, p. 15). Although Appellants' counsel was silent during this litany and only responded when invited to by the trial court, Kim's counsel's complaints nevertheless resulted in the trial court's warning to Appellants' counsel to not "object to everything he says. I'll shut you down if you try that." (Tr, Vol. I, p. 8).

[12] Kim's counsel continued his diatribe on the morning of trial. The weekend prior to trial, the parties had agreed to stipulate to a list of exhibits, but on the morning of trial, Kim's counsel withdrew all stipulations. Kim's counsel explained to the trial court that "maybe we could both try to be cooperative. But that's getting back to that piss-ant stuff, and I don't want to and I agree with you that I don't want to go back to that again. But I don't think I have objections to hardly any of those things to tell you the truth." (Tr. Vol. II, pp. 36-37). At that point, Appellants' counsel became emotional and her co-counsel reminded the court that:

> At that pretrial [], he had filed that motion where he had alleged that [Appellants' counsel] acted in bad faith and you gave him plenty of time to explain how and he couldn't really come up with a good reason, but he did talk for about an hour about how [Appellants' counsel] had supposedly not been acting in good faith.

(Tr. Vol. II, p. 38). Noticing the emotional breakdown, the trial judge reprimanded Kim's counsel and required him to apologize without trivializing his egregious attitude. "Having irritated her to the point that she's going to lose it, I need you to talk to her nicely and not giggle about it." (Tr. Vol. II, p. 39). Later during the trial, Kim's counsel omitted to inform the trial court of an out-of-courtroom conversation with one of the alternate jurors, which ultimately resulted in the alternate juror being dismissed from the proceedings.

[13] During these proceedings, the trial judge did not conduct herself in the patient, dignified, and courteous manner expected of judicial officers either. Her comments ranged from chiding counsel as "the children are not playing nice again" and making derogatory remarks by congratulating counsel when she "behaved very well," to advising the jurors that the court and the attorneys were "going to have a courtroom brawl first" before they would be allowed to view a certain exhibit. (Tr. Vol. I, pp. 132, 38; Vol. II, p. 158). The trial judge denied Appellants' counsel's request to develop her objections on the record, referring to her judicial power to "cut her off" in front of the jury, but allowed Kim's counsel to testify for his client and allowed him to use leading questions on direct interrogation over Appellants' objection. (Tr. Vol. III, p. 13).

[14] While some of these problems, standing alone or cumulatively, could create reversible prejudice against the Appellants, we nonetheless prefer to reverse this cause on a point of law.

I. *Information Requested by the Jury*

[15] One of the contentions raised by Appellants is the trial court's emphasis on certain jury instructions when, after deliberations commenced, the jury requested advice on the theft charge.[1] The record reflects that the jurors requested clarification on jury Instruction No. 14, which comprised the elements for theft, and whether the jury had to consider

> each one individually or could someone be part of a theft even if they, if they only helped someone, rather than actually got some of the money themselves. They asked [the trial judge] that question. I proposed to just tell them to read [instruction] 14 and 20 together, because 20 was the further definition of theft. [Appellants' counsel] objected to that and said that was, would be error to do that, and over her objections, what I said to them was simply, read 14 and read 20. That's all I said, then I left. So that's what we have. I don't think there's anything else we have to put on the record is there?

(Tr. Vol. IV, p. 165).

[16] In *Cameron v. State*, 383 N.E.2d 1039, 1041 (Ind. 1979), our supreme court held that

> The law is clear that final instructions are not to be orally qualified, modified, or in any manner orally explained to the jury by the trial judge. Instructions given to the jury should be considered and construed as an entirety. Thus, by calling back the jury during deliberations, and emphasizing a particular

---

[1] Although Appellants did not raise this contention in their motion to correct error, it was included in their appellate brief. As this ground for appeal is not a mandatory issue to be raised by a motion to correct error, it was appropriately preserved for appeal and this court's review. *See* Indiana Trial Rule 59(D).

instruction or a particular aspect of the case, the trial court commits reversible error.

"A better solution is the employment of the accepted procedure which has been used effectively to respond to any type of problem occasioned by a jury during its deliberations." *Ind. State Highway Com. v. Vanderbur*, 432 N.E.2d 418, 426 (Ind. Ct. App. 1982) (quoting *Lewis v. State*, 424 N.E. 2d 107, 111 (Ind. 1981)). The proper procedure is for the court to call the jury back in open court in the presence of all of the parties and their counsel, if they desire to be there, and to reread all instructions given to them prior to their deliberations, without emphasis on any of them and without further comment. *Id.*

[17]  However, in previous years, trial courts have been "given greater leeway to 'facilitate and assist jurors in the deliberative process, in order to avoid mistrials.'" *Ronco v. State*, 862 N.E. 2d 257, 259 (Ind. 2007) (quoting *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind. 2002)). Recently, we have started to recognize that there are potentially two protections involved in communicating with the jury after deliberations begin: a statutory protection and a common law protection. *Bouye v. State*, 699 N.E.2d 620 (Ind. 1998). The statutory protection is found in Indiana Code section 34-1-21-6, which provides:

> After the jury ha[s] retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their attorneys.

Where the jury does not explicitly manifest any disagreement about the testimony or does not ask for clarification of a legal issue, the statute does not apply. *Id*. at 627; *see also Riggs, v. State*, 689 N.E. 2d 460 (Ind. Ct. App. 1997).

[18] Unlike the statutory protection, the common law protection applies whenever jurors request any type of additional guidance from the court. *Bouye*, 699 N.E.2d at 628. We have repeatedly noted that the proper procedure is for the judge to notify the parties so they may be present in court and be informed of the court's proposed response to the jury before the judge ever communicates with the jury. *Id*. When this procedure is not followed, it is an *ex parte* communication and such communications between the judge and the jury without informing the parties are prohibited. *Id*. In *Moffat v. State*, 542 N.E. 2d 971, 975 (Ind. 1989), the jury sent a note requesting several definitions and asked to see the State's exhibits again. The trial court reconvened the jury in open court and answered the first questions by rereading the final jury instructions. *Id*. at 974. The trial court denied the jury's request to see the exhibits without comment. *Id*. Our supreme court held that, "no reversible error occurred [] even if an *ex parte* communication in fact occurred between the jury and the trial court. The trial court simply reread the instructions without further comment." *Id*. at 975.

[19] The record reflects that, upon receiving the jury's request for clarification on a point of law in the jury instructions, the trial court telephoned counsel for the respective parties to discuss the request off the record. The trial court suggested to advise the jurors to read instructions 14 and 20 together. Appellants' counsel

objected, but the trial court proceeded with its advice to the jury over Appellants' objection and without giving respective counsel an opportunity to be present.

[20] As the jury sought clarification on a point of law, the statutory protection against *ex parte* communications comes into play. *See* Ind. Code § 34-1-21-6. Pursuant to the statute, counsel was notified and informed of the trial court's suggested communication to the jury. However, "the process of jury deliberations is a sensitive point in the trial. Deliberation is the process by which the jury resolves the dispute before it on the basis of evidence and instructions given in open court. When this process is interrupted by an *ex parte* communication, the presumption is that the jury is influenced." *Smith v. Convenience Store Distrib. Co.*, 583 N.E.2d 735, 738 (Ind. 1992). Thus, the danger of an *ex parte* communication is the extraneous influence the judge may have over the jury by his communication. *Id.* Instructions given to the jury should be considered and construed as an entirety. *Cameron,* 383 N.E.2d at 1041. As such, by instructing the jury to read jury instructions 14 and 20, the trial court emphasized these particular instructions and aspects of the case. In this regard, the judge's communication presented an extraneous influence on the jury's deliberation and amounted to reversible error.

## II. *Theft*

[21] After deliberations, the jury returned a verdict on the theft charge, finding Appellants responsible for the theft of Kim's $150,000 intended for the purchase

of the Sake Bar.  Appellants now contend that there is insufficient evidence to support this verdict.

[22] Theft requires proof that a person knowingly or intentionally exerted unauthorized control over the property of another person … with the intent to deprive the owner of the property of any part of the property's value or use. I.C. § 35-43-4-1.  In accordance with Indiana Code section 35-41-2-2(a), "A person engages in conduct intentionally if, when he engages in the conduct, it is his conscious objective to do so."  Subsection (b) of the statute provides that "A person engages in the conduct knowingly if, when he engages in the conduct, he is aware of a high probability he is doing so."  And a person's control over the property of another is unauthorized if it is exerted in a manner or to an extent other than that to which the other person has consented.  I.C. § 35-43-4-1(b)(2).  It should be noted that a criminal conviction for theft is not a condition precedent to a civil action for theft.  *Cf. Breinig v. Harkness*, 872 N.E.2d 155, 159 (Ind. Ct. App. 2007) (discussing establishment of civil action for conversion), trans. denied.  Rather, a claimant must merely prove commission of the crime by a preponderance of the evidence.  *Id*.

[23] The record reflects that in 2014, Kim was investigating a legal way to re-enter the United States after previously having been denied entry.  Because the E-2 visa provided her with such an opportunity on the condition that she made a business investment in the United States, Kim became interested in purchasing the Sake Bar after talking with Choi.  As such, Kim testified that she entered into an agreement to purchase the Sake Bar and sent a total of $150,000 to Oya,

the company owning the Sake Bar and of which Park was the sole shareholder. Although she disclaimed her signature on the Asset Purchase Agreement—which she affirmed under oath was true to her knowledge for immigration purposes—Kim testified that she "wanted to buy Sake Bar." (Tr. Vol. III, p. 17).

[24] After arriving in the United States in July 2015, Kim lived with Choi and worked at Sobon, Choi's restaurant. She testified that she expected Appellants to assist her in operating the Sake Bar, although she admitted that she never asked them explicitly. Kim acknowledged that Park advised her to change the utilities of Sake Bar into her name upon arriving in the United States. Park testified that he informed her to open up a bank account for the Sake Bar so she could start operating the business. Kim never changed the utilities into her name but did obtain a bank account for the Sake Bar. There is no evidence in the record that Kim ever demanded the return of the purchase price. Rather, on November 15, 2016, pursuant to the terms of the Asset Purchase Agreement, Park provided Kim with a notice of breach of contract because she had "neither taken affirmative steps to take over the Sake Bar nor has she fulfilled her obligations to start taking over the running or liabilities of Sake Bar, including but not limited to starting up utilities in her name, taking on the lease payments and providing workers and management for the restaurant." (Exh. Vol. III, p. 78).

[25] Kim now contends that although she sent the purchase amount of $150,000 to Oya, the funds were used by Chong to build the hibachi grill. The purchase

amount was received into the account of Oya, of which Park was the sole shareholder. The record reflects that Park, as owner of Japonee and the Sake Bar, directed Chong, as manager of the building housing the restaurants, to use the $150,000 purchase price to build the hibachi grill. As Kim had voluntarily sent the money to Oya with the intent to purchase the Sake Bar, and Park had received the money with intent to sell Kim the Sake Bar, Park legally received the funds and could provide them to Chong with the authorization to use them for the hibachi grill.

[26] Accordingly, in light of the facts before us, Appellants did not gain unauthorized control over Kim's funds with the intent to deprive Kim of this property. Kim paid the purchase price with intent to buy the Sake Bar. Park, as sole shareholder of Oya, received the funds and intended to sell her the Sake Bar. Appellants advised her on numerous occasions to make the necessary arrangements to take control of the Sake Bar. Kim never requested the return of the funds; instead, Park notified her that she was in breach of contract by failing to take control of the Sake Bar. As Kim failed to establish the elements of theft by a preponderance of the evidence, we reverse the verdict.[2]

---

[2] Because Kim is no longer the prevailing party, we also reverse the attorney fees awarded to her by the trial court.

# CONCLUSION

[27] Based on the foregoing, we hold that the trial court committed reversible error by emphasizing certain jury instructions after deliberations commenced and Kim failed to establish theft by a preponderance of the evidence.

[28] Reversed.

[29] Mathias, J. concurs

[30] Tavitas, J. concurs in part and dissents in part with separate opinion

| | |
|---|---|
| Kyung Sil Choi, Bo Kang Park, and Han Chong, | Court of Appeals Case No. 19A-PL-1429 |
| *Appellants-Defendants,* | |
| v. | |
| Jung Hee Kim, | |
| *Appellee-Plaintiff.* | |

**Tavitas, Judge, concurs in part and dissents in part.**

[31] I respectfully concur in part and dissent in part with the majority's opinion.

[32] I agree that the trial court's communication with the jury during deliberations amounted to reversible error. The majority opinion, however, merely reverses the judgment. The proper resolution of this issue is to reverse and remand for a new trial. *See Dowell v. State*, 973 N.E.2d 58, 62 (Ind. Ct. App. 2012) (reversing and remanding for a new trial); *Jenkins v. State*, 424 N.E.2d 1002, 1004 (Ind. 1981) (reversing and remanding for a new trial). Because Appellants are entitled to a new trial, it is unnecessary to address the parties' remaining arguments. I would not address the sufficiency of the evidence given the need for a new trial at which different evidence could be presented.

[33] Even if it was necessary to address the sufficiency of the evidence, I disagree with the result reached by the majority on this issue. In a civil case, an

argument that the evidence is insufficient is generally presented by way of a motion for judgment on the evidence. *See* Ind. Trial Rule 50. Trial Rule 50(A) also allows the argument to be presented in a motion to correct error. *See Henri v. Curto*, 908 N.E.2d 196, 206 (Ind. 2009) (noting that Trial Rule 50(A)(4) authorizes a party to move for a judgment on the evidence in a motion to correct error). Here, after the jury's verdict, Appellants filed both a motion for judgment on the evidence and a motion to correct error. The trial court denied the motions and found: "Defendants' counsel is asking this Court to invade the province of the jury and direct a verdict in favor of her clients. The jury was completely within its rights to disbelieve the Defendants and believe the Plaintiff. There is no basis for saying otherwise, unless one reweighs the evidence and the credibility of the parties. The Court cannot do what Defendants' counsel asks." Appellants' App. Vol. II p. 19. I agree with the trial court and conclude that the majority opinion reweighs the evidence and judges the credibility of the witnesses.

[34]  For these reasons, I concur in part and dissent in part.

[35]